**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.:** _____

GAVIN JOHNSON, individually and on
behalf of all others similarly situated,

 Plaintiff,

v.              JURY TRIAL DEMANDED

CONSTELLATION BRANDS, INC.,
a Delaware corporation, and
CONSTELLATION BRANDS U.S.
OPERATIONS, INC., a New York
corporation,

 Defendants.

_____/

## <u>NATIONWIDE CLASS ACTION COMPLAINT</u>

Plaintiff, Gavin Johnson ("Plaintiff"), brings this class action against Defendants, Constellation Brands, Inc., a Delaware corporation, and Constellation Brands U.S. Operations, Inc. a New York corporation, (collectively "Defendants" or "Constellation") on behalf of all consumers that have purchased falsely marketed tequila from Defendants' Casa Noble Tequila brands.

### I.  **<u>INTRODUCTION</u>**

1. In the world of tequila, the *tequilana weber* blue variety of agave ("Blue Weber agave") is regarded as the gold standard. Indeed, the Blue Weber agave variety is the sole variety used in the production of true tequila. Blue Weber agave is native to Jalisco, Mexico and certain surrounding areas.

2. Blue Weber agave production is highly regulated, and consumers pay a premium for agave spirits made from 100% Blue Weber agave as a result. By way of example, Blue Weber agave takes longer to harvest because it must be grown and harvested once the plants reach full maturity (which can take 5 to 10 years). The plants must also be grown and harvested within certain

areas, and specific traditional harvesting practices must be employed. These restrictions are enforced by Mexico's Tequila Regulatory Council, *Consejo Regulador del Tequila, A.C.,* ("CRT") and are meant to protect the authenticity and quality of tequila and ensure that tequila produced outside the designated geographic regions cannot be labeled as such.

3. Tequila is made from the heart of the blue agave plant, commonly referred to as the piña. The piña is heated to break down its complex sugars, and crushed to extract its sugary juice, which is then fermented with yeast, transforming those sugars into agave-derived ethanol (alcohol), which is distilled into tequila.

4. The Casa Noble brand carries no less than four agave spirits that Defendants categorize as "100% AGAVE AZUL" on the face of the bottles: Blanco, Reposado, Añejo, and Marqués De Casa Noble Añejo (collectively "Casa Noble," "Casa Noble Tequilas" or the "Products"). The Products are sold nationwide.  All of the Products begin with the initial distillation of Casa Noble Blanco, which serves as the foundation for the entire line of Casa Noble Tequilas.

5. Plaintiff and others similarly situated paid premium prices for the Products in reliance on Defendants' representations on the Products' bottles that the Products were created from 100% Blue Weber agave.

6. For example, Plaintiff purchased a bottle of Casa Noble Blanco that – just as with every bottle of Casa Noble Blanco – expressly provides on its front label that it is "100% Agave Azul."



7.      However, testing of Casa Noble Blanco, as well as Casa Noble Reposado, and Casa Noble Añejo, has established that the Products contain material amounts of ethanol *not derived from agave plants*, and, as such, is enhanced with ethanol other than that obtained from *tequilana weber* blue variety agave.  Upon information and belief, as all of the Products are made utilizing Casa Noble Blanco as a base spirit, and as a result, all of the Products are similarly adulterated.

8.      If Plaintiff, and others similarly situated, had known the truth of the ingredients in the Products, he would not have purchased the Products or would have paid less for them. Plaintiff, and others similarly situated, intends to, seeks to, and will purchase the Products in the future if he can do so with the assurance that the Products are in fact made from 100% Blue Weber agave as represented. Because Defendants continue to label and market the Products as "100% AGAVE AZUL" despite the adulteration described herein, Plaintiff and others similarly situated are presently, and will continue to be, unable to rely on those representations. For these reasons, and as further detailed below, Plaintiff brings this claim on his own behalf and on behalf of other consumers of Defendants' Products.

## II.     PARTIES

**Plaintiff**:

9.      Plaintiff is a resident and citizen of Florida and is otherwise *sui juris*. As detailed below, Plaintiff purchased Products from establishments authorized to sell the Products in Florida. By way of example, on December 1, 2025, Plaintiff purchased a bottle of Casa Noble Blanco Tequila from Gopuff Liquor & More in Florida.  *A true and correct copy of Plaintiff's receipt for this transaction is attached as Exhibit A[1].*

10.      Plaintiff purchased these Products, in material part, because they purportedly were created from 100% Blue Weber agave, as represented on their label. Prior to purchase, Plaintiff read and relied on Defendants' representation that the Products were "100% AGAVE AZUL." When Plaintiff purchased the Products, he was unaware that Defendants had misrepresented the composition and ingredients of the Products, such that he would not have purchased the Products or would not have paid as much for them as he did. Plaintiff, at all times believed, as a result of Defendants' representations both online and on the packaging of the Products he purchased, that the tequila he purchased was premium and pure tequila made of 100% Blue Weber agave.  Had Plaintiff known the Products were not 100% Blue Weber agave, he would not have purchased the Products or would have paid less than he did.

**Defendant**:

11.      Defendant Constellation Brands, Inc., ("Constellation Brands") is a Delaware corporation with its principal place of business in New York and manufactures and markets the Products at issue in this litigation.  Constellation Brands engages in business throughout the United States, including, without limitation, in the State of Florida.

---

[1] In accordance with Fed. R. Civ. P. 5.2(a) and S.D. Fla. Local Rule 5.4, sensitive, confidential, or private personal information has been redacted from the exhibit.

12.     Defendant Constellation Brands, U.S. Operations, Inc., ("CBUS") is a New York corporation with its principal place of business in New York and manufactures and markets the Products at issue in this litigation.  CBUS engages in business throughout the United States, including, without limitation, in the State of Florida.  Upon information and belief, CBUS is a wholly owned subsidiary of Constellation Brands.

## III.     JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this class action under 28 U.S.C. § 1332(a)(1) because Plaintiff has a good-faith basis for an amount in controversy that exceeds the sum or value of $75,000, exclusive of interest and costs, and because the matter is between citizens of different states. In addition, this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2)(A) of the Class Action Fairness Act of 2005 because: (i) there are 100 or more putative class members; (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (iii) there is diversity because Plaintiff and Defendants are citizens of different states.

14.     This Court has personal jurisdiction over Defendants because they have substantial aggregate contacts with this District, including engaging in conduct in this District that has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, including by marketing and selling the Products to consumers in this Judicial District, by placing the Products into the stream of commerce directed at this Judicial District, and because Defendants purposely availed themselves of the laws of the State of Florida by marketing and distributing the Products within Miami-Dade County, Florida and the State of Florida. Defendants' purposeful availment and extensive contacts with Florida renders the exercise of jurisdiction by this Court over them permissible under traditional notions of fair play and substantial justice.

15.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because Defendants transact business within this District and Defendants have intentionally availed themselves of the laws and markets within this District.

16.     All conditions precedent to this action have occurred, been performed, or have been waived.

### IV.     FACTUAL ALLEGATIONS

17.     ***Defendants and the Tequila Market.*** Tequila's popularity among consumers stems from several factors including its versatility; its perception as a "healthier" or "cleaner" choice than other spirits; a growing trend of consumers seeking authentic and premium beverage experiences; its cultural connection to Mexico; and the significant role of social media marketing and celebrity endorsements in expanding tequila's appeal.

18.     ***The Regulation of Tequila Manufacturing and Labeling.*** Like champagne and cognac, tequila is a product of *origin*. Tequila can only legally be made in Mexico: specifically, in the states of Jalisco, Tamaulipas, Nayarit, Michoacán and Guanajuato. Mexico's Tequila Regulatory Council, *Consejo Regulador del Tequila, A.C.* ("CRT"), the Conformity Assessment Body for NOM-006-SCFI-2012-Alcoholic Beverages-Tequila-Specifications ("Tequila NOM") regulates the manufacturing of tequila.[2]

19.     The Tequila NOM in section 6.1.1.1 states that the addition of sugar-based syrups "must not be more than 1% in relation to the total Tequila weight before it is bottled."

20.     Under section 5.1.1 of the Tequila NOM, a product labeled "100% agave [azul]" or "100% de agave" is "a product whose fermentation may not be enhanced with sugars other than

---

[2] *Official Mexican Standard NOM-006-SCFI-2012 Alcoholic Beverages -Tequila - Specifications Courtesy Translation*, https://www.crt.org.mx/wp-content/uploads/2024/01/NOM-006-SCFI-2012%20-%20INGLES.pdf.

those obtained from the *tequilana weber* blue variety Agave grown in the territory specified in the Declaration" (i.e., in the states of Jalisco, Tamaulipas, Nayarit, Michoacán and Guanajuato).

21.     "100% agave" tequila, as expressly defined in NOM § 5.1.1 is different from "Tequila" as defined in NOM § 5.1.2.  A key distinguishing difference between 100% agave tequila and "tequila" is that "tequila" may have "other sugars in a proportion not to exceed 49% of total reducing sugars expressed in units of mass. This maximum enhancement of up to 49% of total reducing sugars expressed in units of mass may not be done with sugars from any species of Agave." However, "[t]he 51% of total reducing sugars expressed in units of mass may only be enhanced with *tequilana weber* blue variety agave . . . ." *See also* NOM § 6.3 (only authorizing tequila that is not 100% agave azul from being "enhanced with other sugars in the fermentation process").

22.     As such, to be labeled as "100% agave," "100% de agave," "100% puro de agave," "100% agave," or "100% puro agave" (inclusive of any combination of these labels with the word "azul" ["blue"]) the product *may not be enhanced with sugars* other than those obtained from the *tequilana weber* blue variety of agave grown in a specific, defined territory.

23.     In short, no sugars other than those obtained from the *tequilana weber* blue variety should be found in a tequila labeled as 100% agave.

24.     Lastly, section 6.5.2.1 requires strict documentation to ensure that tequila "has not been adulterated in the manufacturing stages of its production."

25.     A tequila labeled as 100% agave will be deemed to have been adulterated in the manufacturing stages of its production if it was not made exclusively from Blue Weber agave sugars. The presence of other sugars impacts the tequila's quality and taste given that the use of other sugars can alter the natural flavor profile of tequila.

RENNERT VOGEL MANDLER & RODRIGUEZ, P.A., ATTORNEYS AT LAW
MIAMI 29TH FLOOR, MIAMI TOWER, 100 S.E. 2ND STREET, MIAMI, FLORIDA  33131-2130 • TEL. (305) 577-4177
BOCA RATON 2000 GLADES ROAD, SUITE 204, BOCA RATON, FL 33431 • TEL. (561) 287-4440

26.     Bottles of agave spirits that fail to provide accurate information in interstate commerce violate the Federal Alcohol Administration Act ("FAAA"), 27 U.S.C. § 205(e), which requires bottles to provide the "identity and quality of the products" and "the alcoholic content thereof," and 27 U.S.C. § 205(f), which requires advertisements of distilled spirits to "provide the consumer with adequate information as to the identity and quality of the products advertised."

27.     Tequila is additionally regulated in the United States by the U.S. Department of the Treasury, Alcohol and Tobacco Tax and Trade Bureau pursuant to 27 C.F.R. Part 5, which regulates the labeling and advertising of distilled spirits.

28.     An agave spirit can only be categorized as tequila where it is "made in Mexico, in compliance with the laws and regulations of Mexico governing the manufacture of Tequila for consumption in that country." 27 C.F.R. § 5.148.

29.     A distilled spirit made from agave plants may only contain added flavoring or coloring materials if they "do not total more than 2.5 percent by volume of the finished product." 27 C.F.R. § 5.155.

30.     ***Widespread Reports of Tequila Adulteration.*** As reported by mezcalistas.com, "[a] traditional blanco tequila doesn't rely on aging or infusions for its alluring and distinctive flavors, which are derived solely from agave, the water source, and the craft of fermentation and distillation. But blue agave takes a long time to mature — five to 10 years — and that creates ongoing tension in the industry, as well as the temptation to cut corners."[3]

31.     Remberto Galván Cabrera, the official spokesperson for the Mexican Agave Council (Consejo Mexicano del Agave or CMXDA), an organization that advocates for the rights of agaveros and transparency in the tequila industry, has explained that "when agave prices were

---

[3] Felisa Rogers, *What are you drinking? Agave farmers allege tequila industry corruption*, Mezcalistas (Jan. 13, 2025), https://www.mezcalistas.com/tequila-industry-corruption/.

high, large tequila companies began mixing cane alcohol into tequila that they sold as 100% agave."[4] This practice remains ongoing.[5]

32.     Consumers have also raised their suspicions that there is significant adulteration of tequila that is exported from Mexico through social media, community-driven forum-style websites, and blind tasting tests.

33.     ***Nuclear Magnetic Resonance Testing Confirms Adulteration of the Products.*** To verify the falsity of Defendants' representations, Plaintiff, through counsel, commissioned Site-Specific Natural Isotope Fractionation-Nuclear Magnetic Resonance ("SNIF-NMR" or "NMR") laboratory testing to confirm, by way of carbon isotope ratio analysis, whether the Products have been adulterated with non-agave alcohol.

34.     This technique, which is widely accepted in food chemistry, identifies the plant origin of ethanol in a spirit by measuring the natural carbon fingerprint of the ethanol in the spirit. This fingerprint – known as a stable carbon isotope ratio ($\delta^{13}C$) – can be used to identify the plant source of the sugars used in fermentation.

35.     Specifically, the carbon composition is analyzed at two parts of the ethanol molecule: the methylene group ($CH_2$) and the methyl group ($CH_3$). Ethanol made from Blue Weber agave, shows a distinct isotope signature compared to cheaper feedstocks like corn or sugarcane, which are $C_4$ plants.[6]

36.     A foundational 2010 study confirmed this distinction and the ability to differentiate authentic 100% agave tequila when applying the analysis to tequila products. When applied to

---

[4] Felisa Rogers, *Agave farmers say they will no longer play nice*, Mezcalistas (Jan. 15, 2025), https://www.mezcalistas.com/breaking-tequila-news/.
[5] *See id.*
[6] *See* Freddy Thomas, et al., *Improved Characterization of the Botanical Origin of Sugar by Carbon-13 SNIF-NMR Applied to Ethanol*, 58 J. AGRIC. FOOD CHEM. 11580, 11580-81 (2010).

tequila, this technique detects the adulteration of tequila labeled as 100% agave by identifying the presence of ethanol made from a source other than Blue Weber agave. By way of example, ethanol made from $C_4$ plants such as corn and sugarcane consistently shows $\delta^{13}C(CH_2)$ values near –13.5‰.[7] In contrast, agave-derived ethanol falls within a range of –7.0‰ to –9.0‰.[8]

37.     The results of the testing commissioned by Plaintiff this year confirmed that Plaintiff purchased tequila from Defendants that did not meet the United States' or Mexico's regulatory requirements for tequila labeled as 100% agave. Plaintiff tested a bottle of Casa Noble Blanco purchased from a retail store in the United States which, yielded a result of $\delta^{13}C(CH_2)$ value of -12.8 ($\pm$ 0.5)‰ and $\delta^{13}C(CH_3)$ value of -14.2 ($\pm$ 0.5)‰.  As such, the isotopic parameters measured were not in agreement with the tested samples' description of 100% agave.

38.     The testing results for Casa Noble Blanco implicates the entire range of the Products as they are created from the same base spirit.

39.     This has been confirmed by testing of bottles of Casa Noble Reposado and Añejo, purchased from different stores than the prior tested Casa Noble Blanco.  Testing of Casa Noble Reposado yielded a result of $\delta^{13}C(CH_2)$ value of -13 ($\pm$ 0.5)‰ and $\delta^{13}C(CH_3)$ value of -11 ($\pm$ 0.5)‰.  Testing of Casa Noble Añejo yielded a result of $\delta^{13}C(CH_2)$ value of -12.4 ($\pm$ 0.5)‰ and $\delta^{13}C(CH_3)$ value of -11.4 ($\pm$ 0.5)‰.  The isotopic parameters of both of these Products were not in agreement with the tested samples' description of 100% agave, nor would either of these results qualify those Products to be described as tequila with a 51% agave alcohol origin.

40.     Plaintiff purchased the Products based on Defendants' representations and would not have paid premium prices but for Defendants' false and misleading statements and omissions,

---

[7] *Id.* at 11583.
[8] *Id.*

in that the Products were overpriced compared to their actual value given that they were not in fact made from 100% Blue Weber agave as represented.

41.     Plaintiff regularly shops at liquor stores, bars, and restaurants that sell Defendants' Products and continues to be exposed to Defendants' "100% AGAVE AZUL" and related purity representations.

42.     Because the composition of the tequila cannot be determined by visual inspection, Plaintiff cannot determine whether Defendants have ceased adulterating the Products or corrected their labeling. As a result, the risk that Plaintiff and those similarly situated will again be deceived and/or overpay for the Products is real, immediate, and ongoing.

43.     Plaintiff intends to purchase Defendants' Products again under the current labeling once they understand the products to truly contain 100% agave and seek the Court's assistance by way of injunctive relief to ensure that Defendants' representations regarding their Products are accurate.

## V.     TOLLING ALLEGATIONS

44.     Plaintiff and other Class members reasonably relied on Defendants' representations and could not have discovered, through the exercise of reasonable due diligence, that Defendants were misrepresenting and concealing the true nature of the Products.

45.      On or about January 13, 2025, agave spirit journalist Felisa Rogers with *Mezcalistas.com* published the English-language article, *Is that really tequila you're buying? Allegations of corruption raise serious questions*.[9] This article covered the prior week's large-scale, peaceful protest by agave farmers in the historic central square of Tequila, Jalisco, where members of the Mexican Agave Council, and *agaveros* (agave farmers) from several states

_____
[9] Felisa Rogers, *Agave farmers say they will no longer play nice*, Mezcalistas (Jan. 15, 2025), https://www.mezcalistas.com/breaking-tequila-news/.

RENNERT VOGEL MANDLER & RODRIGUEZ, P.A., ATTORNEYS AT LAW
MIAMI 29TH FLOOR, MIAMI TOWER, 100 S.E. 2ND STREET, MIAMI, FLORIDA 33131-2130 • TEL. (305) 577-4177
BOCA RATON 2000 GLADES ROAD, SUITE 204, BOCA RATON, FL 33431 • TEL. (561) 287-4440

convened to make demands on the tequila industry, including *inter alia:* "*NO MAS TEQUILA ADULTERADO!!!*" (translation: NO MORE ADULTERATED TEQUILA!!!), and "*EL TEQUILA DEVE SER 100% AGAVE!!*" (translation: TEQUILA MUST BE 100% AGAVE!!").[10]



Hundreds of protesters gathered to protest alleged tequila industry corruption

46.    Only after that public protest and the subsequent coverage by *Mezcalistas* and other trade publications, could Plaintiff or other Class members reasonably have learned of the adulteration of purported 100% agave tequila with other forms of alcohol.

47.    For these reasons, the applicable statutes of limitations for all claims should be tolled until at least January 13, 2025.

## VI.    CLASS ALLEGATIONS

48.    Plaintiff brings this action individually and as representatives of all those similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the below-defined classes:

    **A. The Nationwide Class:** All persons in the United States who purchased one or more of the Products during the applicable statute of limitations period.

    **B. The Florida Subclass:** All persons who purchased one or more of the Products in Florida during the applicable statute of limitations.

---

[10] *Id.*

49.     Excluded from each class are Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees; the judicial officers and their immediate family members and associated court staff assigned to this case; and persons who properly execute and file a timely request for exclusion from the Class.

50.     The classes described in this Complaint may be jointly referred to as the "Class" or "Classes" and members of the proposed classes may be jointly referred to as "Class members." Plaintiff reserves the right to amend or modify the Class definitions with greater specificity, further division into subclasses, or with limitation to particular issues as discovery and the orders of this Court warrant. In addition, the Court can define the Classes and create additional subclasses as may be necessary or desirable to adjudicate common issues and claims of the Class members if, based on discovery of additional facts, the need arises.

51.     Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making final injunctive relief or corresponding declaratory relief and damages appropriate with respect to the Classes as a whole. Defendants presently and continuously falsely market and sell the Products as tequila made from 100% agave despite using sugars that were not derived from the Blue Weber agave variety, and absent injunctive relief will continue doing so, thereby subjecting Plaintiff to an ongoing risk of future deception and economic injury whenever they encounter or purchase the Products.

52.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

53.     As set forth in detail below, this action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

**Numerosity/Manageability**

54.     This action satisfies the requirements of Rule 23(a)(1).  The members of the Class are so numerous that individual joinder of all Class members is impracticable. On information and belief, Class members number in the thousands. Defendants sell at least tens of thousands of cases of their tequila Products each year. The precise number or identification of members of the Class is presently unknown to Plaintiff, but may be ascertained from (i) Defendants' books and records, (ii) the books and records of third-party retailers that maintain records of Class member purchases and contact information, and (iii) industry statistics. By way of example, upon information and belief, Florida is the third largest consumer of tequila in the United States.[11]

55.     Plaintiff anticipates providing appropriate notice to Class members in compliance with Rule 23. By way of example, Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, email, text messages, social media, online advertisements, and/or published notice.

**Commonality**

56.     This action satisfies the requirements of Rule 23(a)(2) and 23(b)(3) because there are questions of law and fact that are common to each member of the Classes.  These common questions predominate over any questions affecting only individual Class members. The predominating common or Class-wide fact questions include, without limitation:

---

[11] Jan Conway, *U.S. Tequila Consumption 2023, By State*, Statista (Feb. 13, 2025), https://www.statista.com/statistics/486797/tequila-consumption-united-states-by-state/#:~:text=In%202023%2C%20tequila%20consumption%20in,ranking%20second%20and%20third%20respectively.&text=Tequila%2C%20an%20agave%2Dbased%20distilled,beverages%20in%20the%20United%20States.

a.  Whether Defendants' marketing of its tequila Products was likely to deceive or mislead reasonable consumers;

b.  Whether Defendants were negligent in marketing its Products as 100% Blue Weber Agave;

c.  Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices by marketing their Products as 100% Blue Weber agave;

d.  Whether Defendants were unjustly enriched;

e.  Whether Defendants violated the consumer protection statutes and common law causes of action alleged herein; and

f.  Whether damages, restitution, equitable, injunctive, declaratory, or other relief is warranted.

## Typicality

57.     This action satisfies the requirements of Rule 23(a)(3) because Plaintiff's claims are typical of the claims of each of the Class members, as all Class members were and are similarly affected and their claims arise from the same wrongful conduct of Defendants.

58.     Each Class member purchased one or more of Defendants' Products and thus as a result has sustained, and will continue to sustain, damages in the same manner as Plaintiff. So long as Defendants maintain the "100% AGAVE AZUL" and related purity representations while adulterating the Products with non-agave ethanol, each Class member faces a continuing risk of economic injury each time they encounter the Products.  The relief Plaintiff seeks in this action is typical of the relief sought for the absent Class members.

## Adequacy of Representation

59.     This action satisfies the requirements of Rule 23(a)(4).  Plaintiff will fairly and adequately protect the interests of the Class members.  Plaintiff is committed to the vigorous prosecution of this action and there is no hostility or conflict between or among Plaintiff and the

unnamed Class members.  Plaintiff anticipates no difficulty in the management of this litigation as a class action.

60.     To prosecute this case, Plaintiff has chosen the undersigned law firm, who has substantial experience in the prosecution of large and complex class action litigation and has the financial resources to meet the costs associated with the vigorous prosecution of this type of litigation. Plaintiff and his counsel will fairly and adequately protect the interest of all Class members.

**Superiority/Predominance**

61.     This action satisfies the requirements of Rule 23(b)(3).  A class action is superior to other available methods for the fair and efficient adjudication of the rights of the Class members. The joinder of individual Class members is impracticable because of the vast number of Class members who own or have purchased any of the Products.

62.     Because the monetary damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions. The burden imposed on the judicial system by individual litigation, and to Defendants, by even a small fraction of the Class members, would be enormous.

63.     In comparison to piecemeal litigation, class action litigation presents far fewer management difficulties, far better conserves the resources of both the judiciary and the parties, and far more effectively protects the rights of each Class member.  The benefits to the legitimate interests of the parties, the court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of

individualized litigation. Class adjudication is simply superior to other alternative procedures for handling the class action given the particular circumstances.

64.     Plaintiff is unaware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  The damages or other financial detriment suffered by Plaintiff and the Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges.

## VII.     CLAIMS FOR RELIEF

### COUNT I – COMMON LAW NEGLIGENCE
**(On behalf of Plaintiff and the Nationwide Class against Defendants)**

65.     Plaintiff incorporates by reference paragraphs 1 through 64 as though fully set forth herein.

66.     Defendants had a duty to accurately label, advertise and market the Products.

67.     Defendants owed Plaintiff and the Nationwide Class the duty of reasonable care, which they breached.

68. Specifically, Defendants owed a duty to Plaintiff and the Nationwide Class members to disclose that the Products are not 100% agave and further owed a duty to ensure that the Products were not adulterated.

69. Defendants breached the duty owed to Plaintiff and the Nationwide Class in intentionally concealing material facts regarding the true nature of the Products, making misleading representations regarding the nature of the Products, and otherwise failing to disclose the same.

70. Defendants' knowing, intentional, or otherwise reckless misrepresentations and omissions were material in that a reasonable consumer would have considered them important in deciding whether to purchase the Products. Indeed, Plaintiff reviewed, considered, and relied on Defendants' representations that the Products were 100% agave in deciding whether to purchase them. Plaintiff and the Nationwide Class members' reliance was reasonable.

71. Absent Defendants' misrepresentations and omissions, Plaintiff and the Nationwide Class members would not have purchased the Products or would not have paid premium prices for the Products.

72. As a result of Defendants' breach of their legal duties, Plaintiff and the Nationwide Class members suffered actual damages, that arose from the natural and foreseeable consequences of Defendants' conduct, in that the adulterated Products were not 100% agave, and, therefore, were not worth the premium price Plaintiff and Nationwide Class members paid.

## COUNT II – NEGLIGENT MISREPRESENTATION
### (On behalf of Plaintiff and the Nationwide Class against Defendants)

73. Plaintiff incorporates by reference paragraphs 1 through 64 as though fully set forth herein.

74. Defendants prominently misrepresent on their Products' front bottle labels that the Products contain 100% agave ("100% AGAVE AZUL").

75. Defendants have continued to make these misrepresentations of material facts to date.

76. At the time, Defendants either knew or should have known they were making misrepresentations of material facts or made the representations without knowledge of their truth or falsity.

77. Defendants' misrepresentations were made with the intent to induce consumers to purchase their tequilas over their competitors' tequila products who did not offer 100% agave tequilas.

78. These misrepresentations of fact concerned the type of information upon which Plaintiff and other reasonable consumers would be expected to rely in making their decisions to purchase Defendants' Products.

79. Consequently, Plaintiff and the Nationwide Class have suffered injury by purchasing Defendants' Products and not receiving what was advertised.

### COUNT III – UNJUST ENRICHMENT
**(On behalf of Plaintiff and the Nationwide Class against Defendants)**

80. Plaintiff incorporates by reference paragraphs 1 through 64 as though fully set forth herein.

81. Plaintiff and the Nationwide Class members conferred benefits upon Defendants.

82. Plaintiff and the Nationwide Class members paid money for the Products, which they would not have purchased or would not have purchased at the same price, had they known that they were enhanced with sugars other than those obtained from the *tequilana weber* blue variety of agave.

---

RENNERT VOGEL MANDLER & RODRIGUEZ, P.A., ATTORNEYS AT LAW
MIAMI 29TH FLOOR, MIAMI TOWER, 100 S.E. 2ND STREET, MIAMI, FLORIDA 33131-2130 • TEL. (305) 577-4177
BOCA RATON 2000 GLADES ROAD, SUITE 204, BOCA RATON, FL 33431 • TEL. (561) 287-4440

83. Defendants have unjustly retained the benefits conferred upon by Plaintiff and the Nationwide Class members.

84. Defendants retained those benefits under circumstances that make it inequitable for Defendants to retain such benefits.

85. Defendants retained these benefits even though the Products were enhanced with sugars other than those obtained from the *tequilana weber* blue variety of agave.

86. If Plaintiff and Nationwide Class members had known the true nature of the Products, they would not have purchased the Products.

## COUNT IV – VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA"), FLA. STAT. § 501.201 *ET SEQ.*
**(On behalf of Plaintiff and the Florida Subclass against Defendants)**

87. Plaintiff incorporates by reference paragraphs 1 through 64 as though fully set forth herein.

88. Plaintiff and the Florida Subclass members are "consumer[s]" engaged in "trade or commerce" within the meaning of FDUTPA. § 501.203 (7), (8), Fla. Stat.

89. Defendants engage in "trade or commerce" within the meaning of FDUTPA. § 501.203(8), Fla. Stat.

90. FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204(1), Fla. Stat.

91. Defendants engaged in unfair and deceptive trade practices that violated FDUTPA, by representing that their Products were 100% agave azul, pure tequila made of 100% Blue Weber agave.

92. Defendants knew or should have known that their representations of the nature and composition of their Products were false but failed to disclose this information to consumers.

93.    Defendants knew that such information was material to consumer transactions and consumers' decisions to purchase the Products.

94.    Defendants actively concealed and misrepresented the true nature of how their Products were manufactured and composition of their Products. Indeed, Defendants concealed and misrepresented that they had in fact utilized sugars other than those obtained from the *tequilana weber* blue variety of agave to enhance their tequila, despite the Products being labeled as "100% AGAVE AZUL."

95.    Defendants intended for Plaintiff and the Florida Subclass members to rely on its misrepresentations and omissions so that Plaintiff and the Florida Subclass members would purchase the Products.

96.    Defendants' unfair or deceptive acts or practices, including concealing, omitting, or suppressing material facts about the composition of the Products had a tendency or capacity to mislead; tended to create a false impression in consumers; and were likely to, and did in fact, deceive reasonable consumers, including Plaintiff and the Florida Subclass members, about the quality and true value of the Products.

97.    Defendants intentionally and knowingly misrepresented or omitted material facts regarding the use of Blue Weber agave with an intent to mislead Plaintiff and the Florida Subclass members into believing that 100% Blue Weber agave was used to ferment the Products.

98.    Defendants knew or should have known that their conduct violated the FDUTPA.

99.    Plaintiff and the Florida Subclass members were and are injured as a result of Defendants' conduct because they paid to own and enjoy 100% agave tequilas. Instead, Plaintiff and the Florida Subclass members received and overpaid for agave spirits whose fermentation was enhanced by sugars other than those obtained from the *tequilana weber* blue variety agave grown in the requisite territory.

100. Defendants' failure to disclose, and active concealment of, the sugars used to ferment the Products, inclusive of the actual amount of Blue Weber agave actually used was material to Plaintiff and the Florida Subclass members.

101. Plaintiff and the Florida Subclass members have suffered ascertainable losses as a result of Defendants' misrepresentations and omissions about the Products. Had they been aware of the true nature of and composition of the Products, they either would have paid less for the Products or would not have purchased the Products. Plaintiff and the Florida Subclass members did not receive the benefit of their bargain due to Defendants' misconduct.

102. As a direct and proximate result of Defendants' violations of FDUTPA, Plaintiff and the Florida Subclass members have suffered injury-in-fact and actual damages.

103. Plaintiff and the Florida Subclass members are entitled to recover their actual damages under § 501.211(2), Fla. Stat. and attorneys' fees under § 501.2105(1), Fla. Stat.

104. Plaintiff and the Florida Subclass members have suffered and will continue to suffer irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices.

105. Because Defendants' false "100% AGAVE AZUL" and purity representations remain on the Products' labels, and on Defendants' marketing, Plaintiff and the Florida Subclass face a real and immediate threat of future injury in the form of purchasing the Products again and risk paying a premium for tequila that is not truly 100% agave, or refraining from purchasing Products they would otherwise buy but for their inability to rely on Defendants' labeling.

106. Plaintiff, on behalf of the Florida Subclass, requests that the Court award them actual damages and issue an order requiring Defendants to properly notify the Florida Subclass members of the true nature of how the tequila Products are made and the amount of Blue Weber

agave used to make them, as well as award Plaintiff and Florida Subclass members' attorneys' fees; and any other just and proper relief available under FDUTPA.

107.    Plaintiff, on behalf of the Florida Subclass, further seeks an injunction to prohibit Defendants from continuing to engage in the false, misleading, and deceptive advertising and marketing practices complained of herein.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Classes, respectfully requests that the Court:

a.   Certify the proposed Classes, appoint Plaintiff as the class representative, appoint Plaintiff's Counsel as Class Counsel, and make such further orders for the protection of Class Members as the Court deems appropriate;

b.   Enjoin Defendants from engaging in the unlawful conduct alleged herein, and order such other injunctive relief that the Court deems just and proper;

c.   Award compensatory damages to Plaintiff and the Class Members, including punitive damages, statutory damages, costs, and disgorgement in an amount to be determined at trial;

d.   Award Plaintiff and Class Members pre-judgment and post-judgment interest, as provided by law,

e.   Award Plaintiff and Class Members their reasonable attorneys' fees and costs as allowed by law;

f.   Enter an order holding Defendants financially responsible for all Class notice and the administration of Class relief; and

g.   Grant Plaintiff and the Class Members any other relief as this Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Pursuant to *Fed. R. Civ. P.* 38(b), Plaintiff demands a jury trial for any and all issues triable by a jury.

Dated: December 16, 2025.

Respectfully submitted,

**RENNERT VOGEL MANDLER & RODRIGUEZ, P.A**.
*Counsel for Plaintiff*
*and the Proposed Class*
Miami Tower, Suite 2900
100 S.E. Second Street
 Miami, Florida 33131
Telephone (305) 577-4177
servicedanielmaland@rvmrlaw.com
servicerobertstein@rvmrlaw.com
servicesandramejia@rvmrlaw.com
servicecatherinewachtell@rvmrlaw.com


*/s/ Daniel S. Maland*
Daniel S. Maland, Esq.
Florida Bar No. 114932
dmaland@rvmrlaw.com
Robert M. Stein, Esq.
Florida Bar No. 93936
rstein@rvmrlaw.com
Sandra E. Mejia, Esq.
Florida Bar No. 1026047
smejia@rvmrlaw.com
Catherine L. Wachtell, Esq.
Florida Bar No. 1037182
cwachtell@rvmrlaw.com